

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF TEXAS
SHERMAN DIVISION**

JUN 2 7 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| **PLAINTIFF/RESPONDENT,** | § | |
| | § | |
| **V.** | § | **CASE NO. 4:18-CR-155-MAC-CAN** |
| | § | |
| **FLOYD DARIL WAGNER,** | § | |
| **DEFENDANT/PETITIONER.** | § | **EMERGENCY PETITION** |

**MOTION AND REQUEST FOR COMPASSIONATE
RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

**TO THE HONORABLE MARCIA A. CRONE, UNITED STATES DISTRICT JUDGE:**

NOW COMES the defendant/petitioner Floyd Daril Wagner
("Wagner") herein appearing in pro se files with the Honorable
Court his Motion and Request for Compassionate Release Pursuant
to 18 U.S.C. §3582(c)(1)(A)(i) and will argue and state the
following:

**I.   PROCEDURAL HISTORY**

On August 2, 2018, Mr. Wagner was arrested on related state
charges.  On August 22, 2018, Mr. Wagner was obtained from state
custody, and placed in the custody of the United States
marshalls.

On September 5, 2018, the Grand Jury for the Eastern
District of Texas, Sherman Division returned a two-count
indictment against Mr. Wagner.  He was charged as follows:
Count 1:  Possession with the intent to distribute oxycodone and
other controlled substance in violation of 21 U.S.C. § 841(a).
Count 2:  Possession of a firearm in furtherance of a drug
trafficking crime in violation of 18 U.S.C. § 924(c).

1

On March 5, 2019, the Presentence Investigation Report was filed with the Honorable Court.

On July 25, 2019 the Honorable Court sentenced Mr. Wagner to 135 monnths and 3 years supervised release as to Count 1 and 60 months and 5 years of supervised release as to Cournt 2, for an aggregate sentence of 195 months and 5 years of supervised release.

On May 3, 2022, Mr. Wagner filed with the Warden of his facility his request *for Compassionate Release.*  See, Exhibit 1, with attachments.

On May 31, 2022, the Warden of his facility denied the request for compassionate release.  See, Exhibit 2.

## II.  JURISDICTION

The Honorable Court has jurisdiction under 18 U.S.C. § 3582(c)(1)(A)(i), in accordance to the provisions of the First Step Act of 2018.  While the Bureau of Prisons ("BOP") is still *provided the first opportunity to decide a compassionate release* request petition, and may still bring a motion on Mr. Wagner's behalf, under Congress' mandates, Mr. Wagner now has further recourse if the Warden and the Director of the Bureau of Prisons declines to follow the medical doctor's professional recommendation that Mr. Wagner shall be released to the community where he can seek and obtain expert medical care for his very rare neurological disease of CADASIL.  See, United States v. Brooker, 976 F.3d 228, 233 (2nd Cir. 2020).

## III.  EXHAUSTION OF ADMINISTRATIVE REMEDY

In accordance to the provisions of the First Step Act

("FSA"), Mr. Wagner has caused to be served on the Warden of his facility his request for compassionate release. (Ex. 1). The Warden has issued his response. (Ex. 2).

As the Act states, Mr. Wagner may go to court "After the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the Warden of the defendant's facility, whichever is earlier." Brooker, 976 F.3d at 233.  See, Ex. 1 and 2.

Mr. Wagner has met the exhaustion requirement of §3582(c)(1)(A)(i), and has exhausted his administrative remedy to the Bureau of Prisons.

## IV.  MR. WAGNER IS TERMINALLY ILL

As Mr. Wagner argued to the Warden of his facility, through support from the Bureau of Prisons, Health Services, and UNT Health Patient Services - Mr. Wagner is terminally ill.

First, in the Warden's compassionate release response he wrongly states:

"RIS consideration may be given to inmates who have an incurable, progressive illness or who have suffered a debilitating injury from which they will not recover.  A review of your medical conditions by the Health Services Department noted your illnesses are not considered life-threatening, nor do you have a higher mortality rate, compared to your peers with similar health conditions." Ex. 2.

However, this is profoundly contradicted by Mr. Wagner's

3

health services medical records.  On October 6, 2021, UNT Health
Patient Services, neurologist clearly states:

"I have seen this patient multiple times for various
neurological complaints, but this patient has a diagnosis of
CADASIL (Cerebral Autosomal Dominant Arterial Sclerosis with
Subcortical Infarcts and Leukoencephalpathy)."

The neurologist further states:

"Please note in my prior dictated note, I state this is a
very rare disorder.  It is irreversible.  There is no cure or
specific treatment for this disorder."  (Exhibit 3, p. 1).

Ultimately, the neurologist clearly states:

"I had also recommended this patient be considered for
compassionate release so that he could attend a tertiary level
medical school-based specialty clinic in cerebrovascular disease
to be followed by a specialist in this disorder so that they may
be able to enroll him in clinical trials that will provide
hopefully a treatment and cure for this disorder in the future
for other patients."  (Ex. 3, p. 2).

The doctor is merely stating as a medical regimen that based
upon his family history of CADASIL (Ex. 3, p. 1), in which no
family member has lived more than two years after being
diagnosed; that, to save other's lives, Mr. Wagner needs to be
in the experimental medical trials while he is alive.  As the
CADASIL has already progressed within his body.

While the neurologist is attempting to state softly that Mr.
Wagner is dying.  He states:

"Risks regarding life expectancy are based on data from the

4

epidemiology regarding all causes of vascular dementia.  In all causes of vascular dementia based on this data, the risks for early death is higher."  (Ex. 3, p. 2).

In the Warden's response, he wrongly and with deliberate indifference to the neurologist's medical regimen, states - "Health Services Department noted your illnesses are not considered life-threatening, nor do you have a higher mortality rate, compared to your peers with similar health conditions." (Ex. 2).

In fact, FMC Fort Worth Health Services has profoundly recommended that Mr. Wagner shall be released to the community under compassionate release.  See, Exhibit 1, Bureau of Prisons Health Services, Clinical Encounter - Administrative note dated September 21, 2021 - titled - Reduction in Sentence encounter performed at Health Services.  In which, Bureau of Prisons Health Services has recommended him for release under the compassionate release due to his terminal illnesses so that he can participate in the tertiary level medical school-based specialty clinic in cerebrovascular disease to be followed by a specialist in this disorder so that they can enroll him in a clinical trial.

Therefore, the Warden's response is a deliberate indifference toward the serious medical needs and risks of Mr. Wagner.  See, Helling v. McKinney, 509 U.S. 25, 35-37 (1993) ("Deliberate indifference" that poses an unreasonable risk of serious damage to future health violates Eighth Amendment); Erickson v. Pardus, 551 U.S. 89, 92-94 (2007)(deliberate

5

indifference claims stated when prison official terminated prisoner's medical treatment for life-threatening liver condition).

The failure to follow the medical doctor's (neurologist) expert recommendation and medical regimen violates Mr. Wagner's Eighth Amendment Constitutional rights.  See also Jehovah v. Clarke, 798 F.3d 169, 181-82 (4th Cir. 2015).

It is clear that the Warden, in his denial is failing to follow the medical doctor's (neurologist) medical regimen, as well as his own Health Services medical staff, that Mr. Wagner's CADASIL diagnosis is terminal, and cannot be cured, and all his peers, such as family members and others have died from CADASIL. Estelle v. Gamble, 429 U.S. at 105-106; Helling v. McKinney, 509 U.S. at 35-37; Erickson v. Pardus, 551 U.S. at 92-94; see also Perry v. Roy, 782 F.3d 73, 79-80 (1st Cir. 2015); Coleman v. Sweetin, 745 F.3d 756, 765-66 (5th Cir. 2014).

The neurologist clearly states:

"I am not commenting at all regarding this patient's legal ramifications for being incarcerated in the Federal Bureau of Prisons or for his compassionate release based on any other character traits, moral issues or medical legal judgment." - "I am only making this comment because I am a Board Certified cerebrovascular specialist and I am speaking from experience regarding his underlying disease.  That is the basis of my comments above."  (Ex. 3, p. 2).  The life-threatening, with a family history of end-of-life trajectory of two years from initial diagnosis of CADASIL, is what the medical expert is

stating that a need for Mr. Wagner to be placed in a tertiary level medical-school based specialty clinic in cerebrovascular disease and to be enrolled in clinical trials.  (Ex. 1, BOP Adm. Note, 9/21/21).

Since also being infected with COVID-19, Mr. Wagner's condition has worsened.  His current illnesses are: (1) Obesity; (2) hyperlipidemia; (3) depressive disorder; (4) migraines; (5) polyneuropathy; (6) disorder of central nervous system; (7) CADASIL; (8) TIA; (9) hypertension; (10) seborrheic dermatitis; (11) disruption of unspecified ligaments; (12) back and foot pain; (13) syncope and collapse (Exhibit 4, 003-005).

Just recently on April 12, 2022, UNT Health Patient Services clearly states:

"Patient has a diagnosis of CADASIL and many of the usual medications are contraindicated.  He has not responded to over-the-counter anti-inflammatories."  Ex. 4, 007-008.

What is occurring, is that without the tertiary level medical school cerebrovascular disease clinical trials - Mr. Wagner could die tomorrow.  (Emphasis Supplied).  Estelle, supra; Helling, supra; Erickson, supra; Perry, supra; Coleman, supra.

The Warden's denial response contradicts and is in deliberate indifference to the medical doctor's (neurologist) medical regimen - that he should be released under compassionate release; his CADASIL disease is incurable; his life-threatening illness has a family history of less than 2 years from diagnosis to death; and the risk to keeping Mr. Wagner in prison without

these trials studies on this CADASIL disease is death, not only to Mr. Wagner, but to others that the studies on his body could save their lives. (Emphasis Supplied). Plus, the Bureau of Prisons Health Services also has recommended that Mr. Wagner be released, this also contradicts what the Warden states in his denial. See, Ex. 1, BOP Health Services, dated 9/21/2021; Ex. 3 and 4. See, e.g. Al-Turki v. Robinson, 762 F.3d 1188, 1193-94 (10th Cir. 2014); Goebert v. Lee County, 510 F.3d 1312, 1329-31 (11th Cir. 2007).

Your Honor, while the tertiary level medical school-based specialty clinic in cerebrovascular disease clinical trials may not save Mr. Wagner's life, they may save others! (Emphasis Supplied). Mr. Wagner fully understands that he is donating his live CADASIL disease body to medical science in an effort to save his life and the lives of others![1]

He is requesting that the medical expert neurologist, and the BOP Health Services' recommendation for compassionate release be GRANTED.

## V. BUREAU OF PRISONS CANNOT PROTECT THE CRITICALLY ILL MR. WAGNER FROM COVID-19

On May 1, 2020, Mr. Wagner was diagnosed with COVID-19. He was diagnosed again on July 6, 2020 with COVID-19. With Mr. Wagner's CADASIL disease, now since his May 1, 2020 COVID-19 infection, he suffers from hyperlipidemia, migraines, polyneuropathy, disorder for central nervous system, hypertension, asthma, seborrheic dermatitis, back and foot pain,

---

[1] See, Exhibit 5 - CADASIL additional information, with results.

headaches, syncope and collapse.  The long-haul effects of COVID-19 has bombarded Mr. Wagner's body.  (Ex. 4, 003-005).

Thousands of inmates and staff have been infected with the COVID-19 virus disease.  Unfortunately, hundreds of inmates and staff have died from COVID-19.

This Court did not sentence Mr. Wagner to prison to be unprotected or provided inadequate medical care.  Wagner is subject to extreme risk to include immediate death as the medical neurologist at UNT Health Patient Services and BOP Health Services have clearly stated in their diagnosis and recommendations.  See, e.g., United States v. Williams, Case No. 3:04-CR-95 (N.S. Fla. 2020); Basank v. Decker, --F.Supp. 3d--, 2020 WL 1481503, at *3 (S.D. NY 2020).

Mr. Wagner has been placed in quarantine on May 1, 2020, June 4, 2020, June 19, 2020 and July 6, 2020.  (Ex. 4, 006). The BOP has not tested him for COVID-19 since April 2021.  Yet, he has these long-haul COVID-19 symptoms.

As recently as April 6, 2022 (see USA Today, April 6, 2022), medical experts clearly stated: "There are no proven treatment for long-haul COVID-19, in part because many different conditions likely fall under the same umbrella term.  It's unclear exactly how many people suffer from long-haul COVID-19, but studies have found as many as 30% of people still have symptoms months after COVID-19 infections.  See, Exhibit 6.

Currently, Mr. Wagner's body does not feel the same, he suffers from shortness of breath, fatigue, swelling, pain, loss of some smell and taste, loss of sleep, in addition to his

diagnosed medical underlying conditions.

Your Honor, it is without a doubt that prisons are a tinderbox for infectious diseases.  The question of whether the government can protect Mr. Wagner from COVID-19 is being answered every day, as outbreaks appear in his facility and other BOP facilities across the country.  See, Ex. 4, 006.  See also, United States v. Rodriguez, Case No. 2:03-CR-271-AB (E.D. Pa. 2020).

As of January 21, 2022, the active (reported) COVID-19 inmate cases in the BOP was 9,020, and the active (reported) staff COVID-19 cases were 1,432.  However, the BOP has a history of not reporting active cases.

The BA.2 COVID-19 virus is 30% to 60% more contagious than Omicron.  The week of March 20, 2022, the BOP unfortunately announced two more deaths from COVID-19.  One death at FCI Coleman-Median and one death at FMC Butner.  One of the two deaths were previously stated as COVID-19 recovered as Mr. Wagner.

In the last 12 months, 56% of BOP inmate deaths of COVID-19 had previously caught the virus but reported by the BOP as recovered.  Yet, as Mr. Wagner they still had symptoms. Unfortunately, as of today, over 300 inmates have died from COVID-19 since April 2020.  Also, unfortunately three inmates recently died from COVID-19 in the last few months at Mr. Wagner's facility.  See, BOP, news release, "Deaths at FMC Fort Worth."

18 U.S.C. § 3582(c)(1)(A)(i) allows the Court to reduce an

inmate's sentence if the Court finds that: 1) extraordinary and
compelling reasons "warrant a reduction", 2) the reduction would
be "consistent with any applicable policy statements issued by
the Sentencing Commission", and 3) the applicable sentencing
factors under §3553(a) warrant a reduction.

It is without any doubts that the Sentencing Commission
*Policy Statement is not mandatory.* See, Brooker, 976 F.3d at
237; United States v. Gunn, 2020 U.S. App. LEXIS 36612 (7th Cir.
2020); United States v. Jones, 2020 U.S. App. LEXIS 36620 (6th
Cir. 2020); United States v. Maumau, 2020 U.S. App. LEXIS 9510
(10th Cir. 2021); United States v. McCoy, 2020 U.S. App. LEXIS
37661 (4th Cir. 2020); United States v. Aruda, 2021 U.S. App.
LEXIS 10119 (9th Cir. 2021); United States v. McGee, 2021 U.S.
App. LEXIS 9074 (10th Cir. 2021); United States v. Shkrambi, 993
F.3d 388, 2021 U.S. App. LEXIS 10053 (5th Cir. 2021).

Detention facilities such as where Mr. Wagner is confined
have even greater risk of infectious disease spread because of
conditions of crowding, the proportion of vulnerable people
detained, and often scant medical care.  (Here Mr. Wagner needs
*to be in specialized care due to his CADASIL disease).*  People
live in close quarters and are subject to security measures
which prohibit successful "social distancing" that is needed to
effectively prevent the spread of COVID-19.  Toilets, sinks, and
showers are shared, without disinfection between use.  Food
preparation and food service is communal, with little
opportunity for surface disinfection.  The crowded conditions,
in both sleeping and social areas, and the shared objects

(bathrooms, sinks, etc.) will facilitate transmission. Rodriguez, 2:03-CR-271, ECF No. 135, p. 16 (E.D. Pa. 2020).

The BOP's COVID-19 protocol is to test only those who are very sick or getting ready to die.  Which the BOP total cases of COVID-19 far outpaces the city as a whole.  Rodriguez, supra at p. 16.

With, Mr. Wagner's current life-threatening CADASIL disease, protecting Mr. Wagner from any disease is challenging, much less from COVID-19.

The government might argue the BOP's containment measures have been successful.  Yet, it is a proven fact they have failed since 2019, and are failing today - which is proven evidence of its insufficient acts to prevent the spread of COVID-19.  Id, at p. 17.

Recognizing the risks of COVID-19 outbreaks in prisons, Congress, the President, and the Department of Justice have begun encouraging steps to release some prisoners, such as Mr. Wagner, to safer home environments.  Id at p. 18.

Profoundly, the BOP cannot protect Mr. Wagner from COVID-19, and as the medical doctor (neurologist) and BOP health services have clearly stated - the CADASIL disease is uncurable and has no known treatment.  Therefore, the doctors, BOP health services, and Mr. Wagner have all agreed that his living body with the CADASIL disease needs to be placed under experimental trials in an effort to save his life, and the lives of others.

While the government also may argue that the vaccine protects Wagner from COVID-19.

12

However, it is a known fact that the Honorable Colin Powell, who was totally vaccinated, and had underlying medical conditions like Mr. Wagner, died from COVID-19, even after being vaccinated.  See, Exhibit 7.

As reported on April 11, 2022, COVID cases are surging again - but who knows.  Testing efforts, accurate counts are almost impossible.  See, Exhibit 8.

People under 50 in US hospitals hits new high.  Exhibit 9. Mr. Wagner with his uncurable CADASIL disease is at serious risk, without being released to the community so that he can enroll in the specialized medical experimental trials to hopefully save other lives, as the CADASIL disease is progressive within Wagner's body.  (Ex. 3, 4).

In the last known report, "Almost 6K infections after shots reported."  Exhibit 10.  Still yet, with Mr. Wagner's CADASIL disease, this is why the medical experts and BOP medical health services staff has recommended that he be placed in trials for this deadly disease, that currently has no cure.  Simply because COVID raises risks for inmates.  Exhibit 11.  Ultimately, while Exhibit 3, 4, 5 clearly supports that COVID patients such as Mr. Wagner with the underlying CADASIL disease, face a higher risk of cardiovascular disease.  See, Exhibit 12.  Even without the deadly CADASIL disease, disorder hits 33% of COVID survivors. See, Exhibit 13.  While, Mr. Wagner suffers from loss of sense of smell and taste, after his COVID-19 infections.  Coupled with his uncurable CADASIL disease, and all his underlying medical conditions.  He is at severe risk of death, and very soon.  See,

Exhibit 14.

Even under the advisory U.S.S.G. § 1B1.13, Application Note 1(D) - (1) the defendant is suffering from a terminal illness. Mr. Wagner is suffering from CADASIL, which as the neurologist clearly states - is uncurable. Ex. 3, 4. His family history is that once a family member is infected with CADASIL, they die within two years of the initial diagnosis. Mr. Wagner is at serious risk, without the compassionate release that will allow his living body to be placed under experimental medical science in an effort to save his life and the lives of others. (Ex. 3, 4, 5).

Also, under Application Note 1(D)(iii) - the defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process (Wagner has an uncurable CADASIL disease) that substantially diminishes his ability to provide self-care within his environment of the correctional facility and for which conventional treatment promises no substantial improvement. Mr. Wagner has been diagnosed with an incurable CADASIL disease, that he will die unless the medical experimental trials on his living body are successful - but, currently there are no cures. He was diagnosed in 2021 with the deadly disease. With a projected life-expectancy of 2023, based upon his family members that had CADASIL and died.

Yes, while §1B1.13, Application Note 1(D) is not mandatory, it is to be used as guidance. Shkrambi, supra; Brooker, supra; Gunn, supra; Jones, supra; Maumau, supra; McCoy, supra; Aruda,

supra; McGee, supra.

It bears remembering that compassionate release is a misnomer.  18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions.  A district court could, for instance, reduce but not eliminate Mr. Wagner's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in it's place.  18 U.S.C. § 3582(c)(1)(A). Further, as is hereto requested, eliminate the balance of his sentence of confinement within the Bureau of Prisons, and allow Mr. Wagner to enroll in the medical experimental trials in an effort to save his life and the lives of others.  The Court can place in the release order, that Mr. Wagner shall within 48 hours of his release that "the patient shall attend a tertiary level medical school-based specialty clinic in cerebrovascular disease to be followed by a specialist in this disorder so that they can enroll him in clinical trial."  That if Mr. Wagner fails to participate in these clinical trials, that he be immediately returned to incarceration and serve the balance of his time.  This Court, beyond this, the Court's broad discretion in this area - as in all sentencing matters - is broad. Brooker, 976 F.3d at 237-238.

Mr. Wagner argues the Court is not bound by U.S.S.G. § 1B1.13, application Note 1(D) does not bind district courts, they are not similarly bound by the Bureau of Prisons updated guidance on which or what counts as extraordinary and compelling reasons.  Id.

## EXTRAORDINARY AND COMPELLING REASONS

What is most important is saving a life or lives by allowing Mr. Wagner to enroll in the medical experimental trials in an effort to find a cure for progressive and aggressive CADASIL disease, since his family has been hit badly with the disease.

As the Bureau of Prisons, health services profoundly recommended on September 21, 2021 - that based on the agencies contract neurologist diagnosis of an uncurable CADASIL disease, that "[i]t is based off this recommendation that we are pursuing an RIS for this inmate at this time." Ex. 1, BOP health services, Adm. notes, September 21, 2021.  The Warden's denial of RIS, is profoundly contrary to the medical health services department's September 21, 2021 recommendation.  As well as the neurologist's medical protocol regimen.  Estelle, supra; Helling, supra; Erickson, supra; Jehova, supra.

In fact, the Warden's reply - a review of your medical conditions by the Health Services Department noted your illnesses are not considered life-threatening, nor do you have a higher mortality rate, compared to your peers with similar health conditions.  Ex. 2.  The medical records "does not support this very wrong statement by the Warden."  Ex. 1, 3, 4, 5.  In fact, Exhibit 3, UNT Health Patient Services clearly states - "there is no known treatment or cure for this disorder, it is assumed this disorder will progress."  Further stating, "[i]t is irreversible.  There is no cure or specific treatment for this disorder."  Mr. Wagner does not know what medical records the Warden was looking at?!

Based upon these extraordinary and compelling reasons, in an

effort to find a cure through medical science trials on Mr.
Wagner's living body, and save the lives of others - the request
should be GRANTED and an order for his immediate release to the
medical trials at once.

As argued above, the life expectancy of Mr. Wagner is
between 2021 and 2023, based upon family members who have been
diagnosed with CADASIL, and died.  This warrants a sentence
reduction to allow the medical research experimental trials for
the CADASIL disease to commence immediately, since Mr. Wagner's
disease is aggressive and progressively getting worse.  As
Exhibit 5 clearly attest, he can die immediately from this
disease.  See, United States v. Williams, Case No. 3:04-CR-95
(N.D. Fla. 2020); Rodriguez, Case No. 2:03-CR-271-AB (E.D. Pa.
2020); United States v. Heitman, 2020 U.S. Dist. LEXIS 103072
(N.D. Tex. 2020).

Mr. Wagner's CADASIL disease is a terminal disease, with no
current cure or treatment.  (Ex. 2, 3, 4, 5).

Based upon his terminal illness, this shall warrant
compassionate release consideration for the first time
non-violent low level drug street dealer.

Mr. Wagner has met his burden of establishing extraordinary
and compelling reasons to GRANT his reduction in sentence (RIS).

**VII.   THE SECTION 3553(a) FACTORS WEIGH IN FAVOR OF MR. WAGNER**

As Mr. Wagner argued to the Warden, his §3553(a) factors
weigh heavily in his favor.  See, Ex. 1, p. 7.

The PSR has Mr. Wagner assessed with Criminal History I.
ECF No. 37, at para. 36.  Therefore, Mr. Wagner does not have

any long criminal history, with an arrest and probation
discharged at age 29 in 2008.  (ECF No. 37, at para. 34, 35).

The Section 3553(a) factors are as follows:

(1) Nature and characteristics of the offense and the history
and characteristics of the defendant.  [Mr. Wagner was not
involved in a large scale distribution ring, or cartel.  Yes,
while selling dosage units of oxycodone is bad, and Mr. Wagner
disregarded the trust of UPS, this error in judgment for this
criminal history category I offender, was basically for a $2 to
$4 dollar for each tablet hustle - that Mr. Wagner strongly
regrets. ECF No. 37, at para. 9. Mr. Wagner has constantly
maintained gainful employment, and also sold vehicles as a
second job. In addition, while Mr. Wagner had 13 firearms in his
residence, there was no connection or confidential informant
information of seeing firearms around any controlled substance
transaction. Mr. Wagner collected firearms and also is an avid
hunter.]

(2) Need for the sentence imposed [the 195 months aggregate
sentence for this first time offender, while it seems harsh. In
calculating the guidelines based upon the drugs amounts prior to
the First Step Act, and the COVID-19 pandemic, with a base
offense level 31, with criminal history I, for sentencing
guidelines of 108-135. The Court has broad discretion at
sentencing as argued above, and may fashion a sentence today
much differently, due to the pandemic and Mr. Wagner's terminal
illness.]

(3) Kinds of sentencing available [Mr. Wagner has filed his
§3582(c)(1)(A)(i) and the medical expert (neurologist) and BOP

18

health services has recommended him for compassionate release, based upon his CADASIL disease, which has no cure or current treatment for clinical experimental trials, in an effort to save other lives, as the disease is aggressive and progressing in Wagner's body. The request for "time served" to be placed in the clinical trials for this CADASIL disease, is in the best interest of justice and society as a whole.]

(4) Kinds of sentence and the sentencing range established for - [Mr. Wagner is terminally ill, and the BOP cannot treat him for his CADASIL disease. Medical protocol and regimen strongly urges the Court for a reduction in sentence through compassionate release as argued above, with supportive Exhibits 1, 3, 4, 5, as well as the long-haul effects of COVID-19 to his terminally ill defendant as argued above with supporting Exhibits 6 through 14. In the interest of justice, medical research and science, and society as a whole; the Court should accept the medical recommendations and issue a "time served" order pursuant to §3582(c)(1)(A), and specify that Wagner must enroll and participate in the clinical trials within 48 hours after his release from prison, or his sentence will be reinstated.]  The Court has this broad discretion.  Brooker, 976 F.3d at 237-238, 18 U.S.C. § 3582(c)(1)(A).

(5) Any pertinent policy statement - [While U.S.S.G. § 1B1.13 Application Note 1(D) is no longer binding authority, it may be used as guidance.  As argued above, even applying Application Note 1(D) - Mr. Wagner has a terminal illness that medical experts want to use him to further develop medical science on this uncurable disease, namely "CADASIL".

In the interest of justice, medical science, and society as a whole, a "time served" reduction in sentence (RIS) is warranted.]

(6) Need to avoid unwarranted sentence disparity [there probably are no other inmates in the BOP with "CADASIL" disease. Plus, very few inmates are terminally ill like Mr. Wagner, and if they are they need to be released from custody. Also, there are probably no other prisoners/defendants in the federal prison system that medical experts want to conduct medical science research and experiments on through trials in an effort to find a cure for this deadly CADASIL disease. In the interest of justice, medical science, and society as a whole, a "time served" sentence reduction is warranted.]

(7) Need to provide restitution [Mr. Wagner does not owe any restitution. However, Mr. Wagner had a $30,000.00 fine, which has fully been paid.]

(8) And, also as part of the §3553(a) factors, at § 2(D) - to provide the defendant with needed educational or vocational training, _medical care_, or other correctional treatment in the most effective manner. [Mr. Wagner, even laboring with the effects of CADASIL disease and long-haul COVID-19 illnesses, still has successfully completed multiple education courses, such as human anatomy, public speaking, and accounting II class. Exhibit 15. He also completed drug education courses. He works as Psychology suicide cadre, working with inmates that may be considering suicide. As for the need of medical care. The institution _cannot_ provide adequate medical care for Mr.

Wagner's CADASIL disease, as well as his long-haul COVID-19[2] related illnesses as argued throughout hereto.   The recommendation by the medical experts for the medical regimen of experimental medicine science trials on Mr. Wagner's living body, would assist hopefully of saving lives of others from the deadly CADASIL disease.   Based upon family history, time is of the essence for these trials on Mr. Wagner.   It is believed that even the government will not object to this medical science need.]

In the recent decision in <u>United States v. Arroyo</u>, 2020 U.S. Dist. LEXIS 118999 (W.D. Tex. El Paso 2020), where the district court considered the nature of his offense/crime when considering his eligibility for early release.   Arroyo was determined to be a career criminal offender, with some violence/violent prior convictions.   <u>Id</u>, at *11-12.   When considering the §3553(a) factors, the district court held: **"Yet today, the context of defendant's incarceration has changed. The COVID-19 pandemic presents a new risk of harm that acutely impacts defendant. More than similarly situated defendants.   18 U.S.C. § 3582(c)(1)(A)(i) exists to permit the court to reconsider its sentencing decision in extraordinary and compelling circumstances such as these."**   <u>Id</u>. at *15-16.

The district court went further, in stating: the potential harm from COVID-19 outweighed the §3553(a) factors.   <u>Id</u>.

---

[2] Exhibit 14 clearly establishes that COVID-19 is still deadly within FMC Fort Worth, as the institution community is operating at "Code Red" as of June 8, 2022.   Still yet, the institution "are not" testing inmates for COVID-19, and very likely unfortunately inmates will die again from COVID-19.

Here, this Court is hit with a double-whammy.  Mr. Wagner is terminally ill from the CADASIL disease, and is also suffering from long-haul COVID-19 related illnesses.  Coupled with his CADASIL underlying medical condition, which triggers his severe risk of COVID-19, which the CADASIL disease has no cure or treatment.  (Ex. 1, 3, 4, 5).

It is without any doubts, that the §3553(a) factors weigh heavily in favor of Mr. Wagner.  Id.

Further, it is profound that the Warden's denial of his recommendation to the Director of the BOP for Wagner's early release was "wrong."  FMC Health Services in Fort Worth, Texas and its contract neurologist all agree, that Mr. Wagner needs to be released to the community to allow the experimental medical science trials on his living body in an effort to find a treatment plan and medical science to hopefully find a cure for CADASIL.  See, Ex. 1, 3, 4, 5.

As the district court held in Arroyo, supra - things have changed.  For sure, things have changed for Mr. Wagner health wise!  (Emphasis Supplied).

## VIII.  SOCIETY GOALS HAVE BEEN MET

It is undisputed that society does not want Mr. Wagner to die in prison, if there is an opportunity through the tertiary level medical school-based specialty clinic in cerebrovascular disease.  Plus, society wants medical science to find a cure for this deadly CADASIL disease.  See, e.g., United States v. Guston, 2021 U.S. Dist. LEXIS 8237, at *4-12 (S.D. Miss. 2021); United States v. Turner, 2021 U.S. Dist. LEXIS 36209, at *2-9

22

(E.D. La. 2021).

Mr. Wagner has served as of April 28, 2022, 3 years 9 months of his sentence.  However, his end of life trajectory, based upon family that have been infected with the CADASIL disease from initial diagnosis, they lived no longer than two years. Mr. Wagner was diagnosed in 2021.

Society does not want Mr. Wagner to die in prison, nor was he sentenced to death.  But, without the emergency medical science trials on his living body, for sure, societies goals have not been met - to save the lives of others affected by CADASIL disease.

Is this enough time to serve for this criminal history category I, non-violent first time offender, with a terminal illness?  Mr. Wagner believes society will most definitely state - "yes."

## IX.   **RELEASE PLAN**

As Exhibit 1 clearly states - in the Bureau of Prisons Administrative Note from Health Services dated September 21, 2021 - after speaking with Mr. Wagner's fiance, the BOP has confirmed his release plan.  He will reside with Brooke Malone, his fiance at 14273 FAA Boulevard #5319, Fort Worth, TX 76115.

### CONCLUSION

For the reasons argued to the Warden of his facility and hereto, Mr. Floyd Daril Wagner request of the Honorable Court to issue an order to reduce his sentence to "time served." Further, to order that he shall enroll in the tertiary level school-based specialty clinic in cerebrovascular disease for

clinical science trials, for the CADASIL disease within 48 hours of the date of this order.  Further, if Mr. Wagner does not enroll and fully participate in this medical science research, he will violate the terms and conditions of this release and shall be returned back to incarceration.

Executed on this, the 10th day of June, 2022 in Fort Worth, Texas pursuant to the penalty of perjury.

Respectfully Submitted,

Floyd Darrl Wagner, pro se
Reg. No. 28014-078
FMC Fort Worth
P.O. Box 15330
Fort Worth, TX 76119

## CERTIFICATE OF SERVICE

I state that on this, the 21 day of June, 2022, I hand-delivered to staff for copying and mailing pursuant to Houston v. Lack, 487 U.S. 266, 270-71 (1988) addressed to the following:

Clerk of the Court
United States District Court
Eastern District of Texas
101 E. Pecan Street, 1st Floor
Sherman, TX 75090

7020 1810 0000 1243 1280

Ms. Tracey M. Batson, AUSA
101 E. Park Blvd., Ste. 500
Plano, TX 75074

Floyd Darrl Wagner